Good morning, your honors. May it please the court, my name is Scott Dixler and I represent Sacramento County. I'll be sharing my time this morning with counsel for the individual defendants and I'd like to reserve five minutes for rebuttal. So how have you decided to split your 20 minutes between you and your co-counsel? I would like to speak for 10 minutes and then counsel for the individual defendants will speak for five minutes ideally and then I'll take five minutes for rebuttal. So what we've got here is 20 minutes per side, so you would like to speak 10 minutes now, save five minutes for later, and Mr. Colantunos has five minutes? That's the idea? That's the agreement. So let's put 15 minutes on the clock, which is your total time, and try to save your five minutes out of that. Okay. Will do. Your honors, the substantive due process theory is on which both sets of plaintiffs, the Hardesty's and the Schneider's, recovered a combined total of $105 million against Sacramento County are legally untenable. I'd like to start with the Hardesty plaintiffs who secured $75 million on the theory that Sacramento County deprived them of their right to pursue a chosen profession. To prevail on that claim, the Hardesty's had to show that the county completely prohibited them from engaging in their chosen profession of mining. Can I, I know you're going to get into the meat of it, and I think it's important. The other side argues that that was waived, because you didn't bring it up until after the trial. That's not an insignificant point that they make. I'd like to know whether that was waived, this chosen profession claim. Your honor, it wasn't waived. True, that specific argument wasn't raised until the Rule 50B motion, so they're factually correct about that. But there's no procedural obstacle to this court's reaching the merits, and there's several reasons why. That is to say, during trial and so on, and during jury instructions and so on, you never argued to the district judge that this does not fall within the profession? The broad, and this, you know, we argue in the brief about the claim argument distinction. The broad claim was made that the substance abuse process claim was legally deficient, but the specific argument, the Rule 50B argument, that they didn't show complete deprivation of the right to engage in the profession, that wasn't made until Rule 50B. So your argument seems to be, and this is where I'm struggling with it, is that, well, we said legally it was deficient, so therefore we preserved every, we preserved a hundred potential arguments for why it was legally deficient. Right, and even if the court isn't willing to go that far, there still is no procedural obstacle to reaching the merits, and I can explain why, because there's several reasons. First of all, the claim presents a purely legal issue. It doesn't go to the facts. The Hardisees aren't here arguing that they would have tried the case differently if only they had been apprised of the proper legal standard earlier. To the contrary, it goes to a legal question, which is, is complete prohibition of the right to engage in a calling the required showing as the county urges, or is a lesser showing of interference with a single business opportunity enough, as the Hardisee plaintiffs argue? But if you were right about that, you should have brought it up at the beginning, because, I mean, now you go through a whole trial, and that's a little bit of the unfairness that happens here, is you go through a whole a decent legal argument that, you know, it's a chosen profession, and it's like, well, what the heck, why'd we have the trial? Well, in that case, though, Your Honor, and you're right that ideally it would have been brought up sooner, but the unfairness to the extent it was was to the county. I mean, the county stood trial unnecessarily. It was an argument the county could have prevailed on earlier. Not only was it not brought up, but you actually acted inconsistent with that particular defense, and I'm thinking about the fact the Hardisees had another operation going on at the same time as this operation at the Big Cut Mine, and you stipulated with the other side not to introduce that evidence at all during the course of the trial. In other words, you agreed to a motion in limine to exclude that evidence. That evidence, if you were pursuing your now theory of lost profession, would have been a perfect defense, would have been a complete defense because, in fact, the Hardisees were actually doing mining at another place at the same time. Right, but the silence in the record favors the county. In other words, it was the plaintiff's burden to show total professional exclusion, and they didn't show that. And, Your Honor, if you'd let me address a couple more reasons why this Court can actually reach the merits of it. The District Court reached the merits of it in the order on post-trial motions. The District Court found the Rule 50A waiver, but nonetheless said that she would address it in the context of ruling on the Rule 59 motion for a new trial. So because this Court has held that where a District Court actually resolves a litigated controversy, the normal waiver and forfeiture rules don't apply, so this Court should take the same course. And at a bare minimum, this Court could take the—well, this Court can—the parties agree this Court can review the issue for plain error, which asks whether there's any evidence in the record supporting the chosen profession theory. And the application of that standard here doesn't make a difference. There is no evidence. They didn't even attempt to make the showing that they were foreclosed from all mining opportunities. They didn't even show that they were, as a matter of law, foreclosed from mining at the—this property. They were only foreclosed from mining without a permit. With respect to the profession—pursue the profession, talk to me about the Schneiders. As far as I can tell, the Schneiders are landlords, and they're getting a dollar per ton. Right. Is that a business or profession? I don't think so, Your Honor, and that's not the claim that the Schneiders pursued a trial. We're attacking—the chosen profession claim was the hardest of these claims, and that's the claim that they failed to prove because they failed to show total professional exclusion. Because you're saying that the jury didn't rely upon that theory, the same theory for the Schneiders, is that right? Yeah, precisely. And I would point the Court to the key jury instruction, which is at page 380 of the excerpts of record, which says very clearly, the hardesty plaintiffs claim that the defendants they have sued deprived them of their substantive due process rights by depriving the hardesty plaintiffs of their right to pursue their chosen occupation, et cetera, through the operation of their mining business. So that is a chosen profession claim, and that was the only substantive due process theory that the hardesty plaintiffs proposed. Now, the Schneider plaintiffs claim was different. The Schneider plaintiffs—the jury was instructed that the Schneider plaintiffs claimed that they were deprived of their substantive due process right by being required to obtain a conditional use permit and rezone in order to allow continued mining. So that wasn't a chosen profession claim. So—and just finally, just to close the loop on the waiver issue, this Court could take the same path at a minimum, and the plaintiffs don't seem to dispute this, that it could be grounds for a new trial, because the District Court actually resolved it, and there's an absence of any evidence this Court should review at a minimum for plain error or grant a new trial. Now, unless the Court has any other questions on chosen profession, I can move on. Separate from the chosen profession issue, the claims of both sets of plaintiffs, the Hardesty's and the Schneider's, fail for an independent reason, and that's that they failed to prove that the county's actions were unreasonable, which they had to do in order to prevail under their substantive due process theory. But that's where you start to get on weaker grounds, it seems to me, because there's evidence here that the county targeted them and treated them differently. And so it seems to me that your best argument is, and you almost have to prove, legally, we can't have this claim. But if legally this claim does exist, then now you've got to show there's absolutely no evidence that they acted unreasonably. And given the emails, given that the jury looked at this and found it, that's a pretty high hurdle for you to meet. Your Honor, I think that the key issue here is what the rule of law is, which is the substantive due process doctrine on which both sets of plaintiffs proceeded. But unreasonable is a really tough standard. That's sort of, I mean, I guess, it's almost like a Fourth Amendment claim, where a jury finds a Fourth Amendment violation, and then we come up and say, well, no reasonable juror could have found that. And that's the struggle I have with this case. I mean, I think you have a pretty compelling argument. $105 million is a little crazy, and I want to ask about some of that, some of those damages. But as to whether any damages could be awarded or whether there's any claim, the unreasonableness is a tough position for you to be arguing. Your Honor, the key case here is Shanks v. Dressel, which said that the irreducible minimum of a substantive due process claim challenging a land use decision is failure of the government's action to be reasonably related to a legitimate public purpose. But the Shanks court went further. But why not, sorry to cut you off, but I know we've got, why isn't it, the vested right is a problem for me. They clearly had a vested right. The county recognized a vested right. And then they wrote him a letter and said, just kidding, you don't have a vested right. Not, you have a vested right, but it's narrowly tailored here. They just said, you have no vested right. Why isn't that unreasonable? Or at least, let me ask it differently. Why isn't that evidence that a juror could find that it's unreasonable? It could be evidence, but the key is, and what I wanted to finish about Shanks, was the court said, if it's even fairly debatable, whether the government action is reasonably related to a legitimate public purpose, no liability. And now that's a difficult standard, but it's meant to be. So in terms of the vested right, so we're not looking at whether, we're not looking at whether there's any evidence that could support it. We are taking a de novo review as a legal matter. That's your position, that we've got to look at this and take it out of the jury. This court is asking whether there was evidence permitting a jury to conclude that it wasn't fairly debatable, that the government, what the government was doing advanced the legitimate public purpose. And here, it was at a minimum fairly debatable. There was, the evidence was contested about the scope of the vested right. The county took the position that the vested right covered only a couple parcels. In her post-trial ruling, the district court thought that the vested right was larger than that. At a minimum, it's fairly debatable. Not every error of state law has constitutional magnitude, and that's a key point. But, and that's the question, but an error that arguably or in fact did shut down their operation here, is there a suggestion that the Schneiders or the Hardesty's shut this down, you know, unreasonably so that they could have operated this? Or is it basically conceded that the regulations forced the shutdown? It's not conceded at all. As a practical matter, they were, the county never ordered them to shut down, as far as I understand it. The county said, you have to get a permit, and they didn't do that. And there's testimony that getting a permit would have been expensive and time-consuming. Yeah, that's right. But, but if they didn't need a permit because there was a vested right, then that seems to be a legally, potentially a legally untenable position. I mean, you, you in your brief have said that the vested right analysis is fact-intensive. That has jury written all over it. But I think with respect, Your Honor, that the vested, the fact-intensiveness also shows why it was fairly debatable, which means that the county wins. At a bare minimum, as Your Honor pointed out, the damages in this case are grossly excessive. Can you, if we need to give you time, I, I'll be honest with you. I, I'm not inclined to just kick out the case and reverse the whole thing, but I would like to find a way to limit the amount, and I'm, I'm struggling with how to do that. So I'd be interested in hearing that. I mean, for example, if we said there's no substantive due process, but, but there is a procedural due process, would that cut the award down? Well, that would cut the award down radically because the plaintiffs only recovered a dollar on their substantive due process claim, which is what they asked for. They only sought nominal damages on procedural. They have $30,000 on the First Amendment. Yeah, $30,000 on the First Amendment. That's right. But the, the, the millions and millions are on substantive due process theory. So $75 million went to the hardesties on the chosen profession theory, which, as I explained, fails as a matter of law from the get-go because they didn't, they didn't show complete legal exclusion, complete prohibition from engaging in a calling. So that, that's out. Well, I, I, I, how did, how did they, how did they get to 100 years? I mean, I know that the reclamation plan classed it for the potential of 100 years, but, I mean, let's face it, no one there will be living in 100 years. Of course. And, and they go, you're using, you're using dollar figures for 100 years of lost profits when, in fact, nobody's going to be around in 100 years. And isn't that just per se excessive? Not only is it per se excessive, it's per se impermissibly speculative, which is a point that the county litigated below and raises again on appeal, which is that a projection that any business, particularly in a highly regulated industry like this, with regulators breathing down its neck from multiple sides, can, can go forever, 100 years, it, it doesn't, it doesn't hold up. But what do we do with that? It seems to me that we almost, if we said, and I don't know where we're going to go with this, but if we said, look, there is some liability here, or at least there's evidence that would support jury liability here, do we just have to send it back for a new trial on damages? That, that, well, of course, I mean, I, I'm, we think the court should reverse with direction to enter judgment on these claims, but short of that, a new trial is, would be appropriate, and that could be, the law favors complete new trials rather than limited new trials, so that's what we would ask for at a minimum. You had said that we would, we should send it back for new trial or issue remitted her. Correct. So, do you think that we would have the power to say, okay, well, let's reduce $75 million to Hardesty Scott, and $30 million to the Schneiders, well, let's reduce it to X. Yeah, this, this court does have the power, we cite the Wright and Miller Treatise that the power of this court is coterminous with the power of the district court in that respect, so yeah, that would be. But, but that has to be based on some evidence, I don't think, I don't think we can go back and just be a jury and say, well, we think they're entitled to, you know, and, and that's where, I mean, we're in a, we're in a difficult spot, it seems to me, I, I, I mean, I have some questions for the other counsel, so anyway, maybe you've got to save the rest for later. Sure, I've got, I've got a minute left. If it's no fault of your own, we've taken you over time, but we'll make sure you get a chance to respond. Thank you, Your Honor. You had put five minutes on the clock. Good morning, Michael Collin, Tuneau, appearing before, for former County Supervisor Roger Dixon, retired County Planning Director Rob Sherry, and retired Senior Planner Jeff Gamble. I've never done a substantial evidence appeal before where I've come to a court and said there's no substantial evidence for what the jury did, but this is the case. I wrote a brief in which I said, here's all the evidence of actual conduct by my three guys that they did, and I had to exhaust all of that evidence, and I expected the respondent's to tell me that I had missed something, and they didn't. What it said was, well, you've got to look at the whole pattern. So the respondent's ... But they do, I mean, there is some evidence here, and that, I mean, look, I don't know whether I would have reached the same conclusion if I was sitting as a juror, but that's not the position that we're in here, and there is evidence, and I'm particularly troubled by the vested right issue, because it seems like the county came in and took an entirely different position on the vested right. That's a big deal here. They didn't write to them and say, hey, you have a vested right, go back to how you used to do it. They said, you're done. We're taking away your vested right, and I don't think they had the legal right to do that. Two ... A couple thoughts on that. One is, I think the legal effect of the April 2009 letters is a question of law for this court. You interpret writings, and I think if you interpret that writing in light of your own precedent in the Guate Christian Fellowship case, because what that letter said, and if you read it, it says, we may take enforcement action against you if you do not concede to our view that you're acting outside your rights. We may take future action. In fact, the county did take future action. A year later, a different agency of the county, where none of my clients are employed, issued a notice of violation, and what did that say? That said, thou shalt stop, or we will seek judicial remedies. Their due process, substantive or otherwise, was going to be in Sacramento Superior Court. We never got there. We never got there because they sued us before the process was completed, but I have a less ambitious argument. That's really the county's argument. I ask you to focus on what my clients were proven to do, and let me start with Rob Sherry, because I think it's my best case. What did they say that he did wrong? He served as a department head. That can't do it. You've got many precedents which say just being there as a supervisor is not sufficient. He signed the April 9th letters on advice of counsel. Maybe there was legal error there, but is this so shockingly beyond social standards that he should be personally held liable for his share of $105 million, plus $750,000 in personal punitives? What's the third thing he did? He participated in meetings and delegated to GAML. Well, in that theory, the two supervisors between GAML and the department head should be in the dock as well. He met with Tygert. Well, Tygert had a constitutional right to meet with the county, and we could not have refused to meet with him. Those are the four acts. So what does the respondent's brief say? Yes, but that letter was testified to, and it had all of these consequences, even after Mr. Sherry retired. That's nuts. That makes Mr. Sherry the guarantor of the behavior of the county until the end of time. Let me look at Mr. Dickinson. What does he like? And Mr. Sherry was also relying upon legal advice. Correct. Correct. When he signed the document, the lawyers said, you can sign this document. Correct. Can I just, since your time is short, Mr. GAML, I'm really interested because you got the letter in April of 2009, which basically they say suggests that they can't operate. Then I think in December, on December 9th of the same year, somehow Mr. GAML has communication with the plaintiffs and says, well, go ahead, you can continue to operate, which is really consistent with this theory that these state agents are acting at the direction of Tykert or are acting in a political way. Basically, I think, it was really unclear from the record really, but is it true that GAML said, go ahead, we'll just continue to operate, we'll resolve this in the future? Correct. Is that what he said? That's correct. And in fact, in 2012, the record shows he sent a letter asking for additional financial assurances to ensure the reclamation of the site. So the continuing relationship is plain. The county never ordered them to stop, and certainly Mr. GAML never did. And Mr. GAML is four levels down from the top of the department head, much less the elected officials. What authority does he have except to write reports and make recommendations? And yet he's being held personally responsible for a million bucks. Why? Because I think the jury was offended by California law allowing his position to be funded by the regulated industry. I think the county was offended by the fact that he wasn't the warmest witness in the witness box and got clocked with some old emails that he didn't remember. But what he did was conduct an investigation. Had he acted unreasonably, it's on the county, not him. This guy makes less than 100 grand a year, and somehow he's on the hook for hundreds of millions of dollars.  We'd have to send it back because, I mean, there's no split between the compensatory damages that are, or do we just say we kick out the individual defendants, but the compensatory damages would stay the same because it's for the conduct? This is really the county's case, but I'll make an observation. One of the telltale signs of excessive damage is the plaintiffs got much more than they asked for. So what they asked for. I agree with that. So what's evident in the record is what they asked for. Even that, to my mind, is a shocking judgment, but it's about half the size of the one you're looking at. But what do we do? I mean, is your position, well, I'll save my questions because if we kick your clients out, then you shouldn't be waiting. Yeah, I think my clients should be out, and I think the punitive should be gone. And just let me- But your argument is, in addition to their conduct, the level of egregiousness that warrants punitive damage has just not been met. I think the best case my colleagues on this side of the aisle can make is legal error by county staff. And some of the conduct they're punishing Mr. Dickinson for is absolutely privileged. They're punishing him for the way he ran a hearing. Somebody's offended they didn't get quite as much time as they'd like. There's calendar management in town board of supervisors, just as there is in a superior court. He's being punished for how he voted. That's absolutely privileged. He's being punished for meeting with a constituent. That's absolutely privileged. He's being punished for taking a campaign donation. That's absolutely privileged. You know, at the bottom of these chains of inferences, which I know you have to indulge the jury, there needs to be an essence of evidentiary fact that is culpable. And for none of these gentlemen, in my view, is it there. So I think the punitives need to go, my guys need to go, and I'm going to leave the county to its remedies. Okay. Thank you very much. Thank you. Good morning, and may it please the court. My name is Chris Ward, counsel for the Hardesty's. The Schneiders join our argument. Can I stop for just a second? I think it should be, are you splitting time, you're splitting time too. I am, your honor, but it should, it's showing 15 minutes, it should be 17 minutes. Okay. We're reserving three minutes for Schneider's counsel, Mr. Ross, but the Schneiders also join. Okay. Let's do a little more housekeeping. So you split at 17-3. Yes, your honor. And you'd like to reserve some time out of the seven, oh no, you don't reserve time, you're just done. We're reserving it for Mr. Ross. Yeah, you just get 17 and the other one, you get three. Okay. Got it. Yes, sir. As the jury found after a long trial on evidence that the trial judge also heard and saw, appellants abused the regulatory powers entrusted to them by putting these two families out of their 30-year business enterprise, all because a large competitor demanded it. Well, wait a minute. How do you mean it's all because? I understand that we've got a competitive relationship among the various people and companies that are doing the mining, but there was a fair amount, there were some other becauses, that is to say there was a substantial expansion of the mining operation. Some of that mining operation was right next to the river. There were federal concerns about compliance with federal law. There was a threat to the county that if you don't start interfering with this operation and enforcing law, we're going to take away your authority to do it. All of that happened without respect to the Teicherts. Your Honor, that was respect to Teichert. The Teichert strategy matrix shows Teichert's detailed strategy over a period of years. No, but what I'm saying is the behavior of the clients, that is to say the property owners, the Schneiders, and the operator of the mining operation, the Hardesty's, that happened without respect to Teichert. Your Honor, those... Teichert didn't make them do that. That's correct, Your Honor, but those concerns, those allegations were debunked as pretextual by the evidence. There were two main pretextual... Does it really matter? Does it matter whether it came from Teichert or whether the county just went off and did this on its own? I mean, that's where I'm struck. I think, I don't mean to cut you off, because you're going to give some evidence, and I think there is some evidence that some of this was done by Teichert, but I have a more fundamental question, which doesn't matter. The county did what the county did. Your Honor, in the context of this case, it matters, and I'll elaborate on why. I think if the county were targeting us for pretextual rationales and did the same conduct, whether Teichert was involved or not, perhaps Teichert's involvement wouldn't matter. But here we have two sides, two sides here, two things we proved. We proved that on the evidence that the motivation was Teichert pressured the county to run us out of business, and the county acceded to that pressure. On the other side, we proved that the environmental rationales they put forth and the so-called expansion rationale they put forth were pretextual. The environmental rationale, we had testimony from their own expert consultant, the county's own guy, who told them that this pit capture idea was not a risk. Their own guy, he told them that during the course of the underlying conduct, and he testified to that on the stand. In addition, there was the inspection of the Office of Mine Regulation, which basically suggested that it was not a real significant environmental concern, but it could become that when water starts flowing into these pits. It was highlighted as maybe something that has to be watched in the future, but it was not necessarily suggesting that the walls, the steep walls, were going to be collapsing. Right, Judge Session. That's always something that has to be watched, and it was watched. There were at least annual inspections. The most recent one was six months, thereabouts, before defendants, in their brief, and throughout their briefs, by the way, defendants rely a lot on their own versions of facts and explanations of facts, and seem to forget that they need to talk about the facts as the jury found them. Are you talking about the inspection in late 2008, when everybody started all of a sudden bombarding the jury? Well, Your Honor, in late June 2008, Mike Winner, who was then the resource manager, did an inspection. He found no violations. He noted that we had the vested rights, so we needed no permit, and he has a notation that the operator is making significant steps toward reclamation. Then in part of the counsel— Was there a pit at that particular point? Is that because not only was there a pit, but also there seemed to be a change in the nature of the product that the Hardesty's were engaged in retrieving. That is, when you start going down into a pit, I guess you get riverbed. Your Honor, there was a pit there. It was pit mining. Let me touch a little bit, too, on the expansion pretext, because that relates to this. There's nothing wrong with expanding mining production within the perimeter of the vested right, and the evidence showed that the vested right covered the entire mine tract. We had the maps that were part of the reclamation plan. The California Calvert case says that the vested right determination determines the scope of the reclamation plan. Can I ask about that? I think you're right. You have evidence of that, but is that a legal question that we can take away and should take away from the jury and decide de novo, or to what extent do we defer to the jury on its factual findings on whether the vested right covered exactly what was being done here? Your Honor, that's a fact question, and defendants in their briefing, they even say the vested right determination is a fact-intensive inquiry. It's interesting, because it's a fact question that seems to be couched in an administrative review, and the trouble I have with this case, potentially, and I don't know if we can navigate that, is there's a lot of administrative facts that need to be found, and every time that becomes a fact question, and the administrative agency gets it wrong, are they then liable for damages of this kind of nature? Your Honor, the fact question is not what is the vested right. It's what did the county determine the vested right was. I don't understand the distinction. The distinction, Your Honor, is in 1994 was the initial vested right determination. There was the letter from the county, Mr. J. Schneider, Mr. Schneider, who is sitting back here, presented, I think over a long period of time, presented evidence to the county of the historic mining. There was this letter that says the gravel mining operation on your property is vested, and they talk a lot in their briefs about the fact that the subject line referred to two parcel numbers. The, there was testimony from Mr. Schneider that that was just a shorthand identifier for the county's file on the whole ranch. So that letter applied to the whole ranch. Then in 2002, after about a two or so, two or three year process, the reclamation plan was developed, and the reclamation plan, the 94 determination, the Calvert case, the California retroactively, it said that determination governs, the 94 determination. It also says the vested right determination is the fulcrum on which everything turns, and it determines the scope of the reclamation plan, which was developed over a period of years, back and forth with the county, formal hearings before the board of supervisors, with the colored maps that the county's planning director, their mining regulator, and their chairman of the board testified, looked at these colored maps and told the jury, I don't know what this means. This is very confusing with all the color overlay. Well, I think that if you start looking in the broader picture here, there is a reclamation plan that has to be submitted, whether or not it's a vested interest, right? And that describes what is reasonably anticipated in the future, and of course, the reclamation plan starts with, oh, it could be the entire ranch, but it really is a fairly small level of extraction. And then you have a dollar amount, which is attributed to the reclamation plan, so that you really can expect, if you're a state regulator, that unless there's a very dramatic change in the quantity of mining, that this is going to be really what's offered. And all of a sudden, they hear from all of these other agencies and individuals that this has expanded enormously. I appreciate that maybe the vested right would suggest that the use permit remains, but still, the regulators have an obligation to go out and look, and then they see this much larger operation than they anticipated, and that they expected from the reclamation plan and the financial contributions that were being made. And this came as somewhat of a shock. Now, maybe their response should have been, go back to what you were doing before. I know that you've made that point, but still, don't they, just as normal human beings, look at this and say, there's something wrong here. This is not what we bargained for back in 2007 and 2008. Your Honor, it was 2002 is when the reclamation plan was approved. Yes. Late June 2008 was at least, there was an inspection at least as of June 25, 2008. And defendants claim in their briefing, though, that by early 2009 or December 2008, Jeff Gamble claims to have been surprised by the mining that was going on. But that was, you know, six months or less after the county inspected. And the evidence shows, there's testimony, nothing was hidden from the county. The county was kept apprised of this. This was, there were annual inspections at least, so nothing was being hidden. The reclamation plan, it gives a best estimate of the projection, but it says, you know, over time, we expect these areas to be mined. It does not limit the scope of production, the intensity. And it expressly says that the intensity of the mining may vary over time in accordance with market conditions. It says, you know, we excavate according to market conditions. There is plenty of testimony that market conditions were very good for the gravel industry in Sacramento County. There was less than 50% of the, less than 10% of the 50-year need. There was a critical shortage, a housing boom. So can I add, I think they're valid points, but is there any limit to the vested right? I mean, your position seems to be, hey, we told them we could get every last bit of gravel or mineral out of this land. And is your position that they could have done anything and there was nothing that could limit the vested right? Your Honor, the limit to the vested right is territorial. So that's your position. Within that territory, you could have done whatever you wanted. Within that territory, you could mine gravel. And I have not read all of the cases. You cite a bunch of cases, but your position is that those cases support that reading of a vested right? Those cases support that. Whether it's the Hansen case, the Hansen case and the Calvert case in particular. So your argument is that the vested right extends to any mining on the property owned by the Schneiders? Within the tract, there's a little bit of the whole ranch that's not included within the mine tract. But in the maps attached to the reclamation plan show the perimeter of the tract. And they show projected mining. Granted, the projection at the time of the reclamation plan was that this would take a longer period of time than it did. But they showed that eventually there was projected mining all over the tract. Is there no plausible legal argument that the grandfathering in of someone who already has been conducting mining prior to the passage of the statute, is there no legal argument that the vested right extends only so far as the nature of the mining that's already being conducted? I think the short answer to that is no. But Now that's different. I said plausible. I understand that that's not your argument. But Is it a totally frivolous argument on the other side? It may not be a totally frivolous argument, Your Honor, but nothing in the vested right determination reflects a limitation on that. Nothing in the reclamation plan reflects a limitation on that. The reclamation plan does reflect, and the underlying evidence of the 94 determination that Mr. Schneider submitted to the county reflects, and this was testified to in some of the documentary evidence that's in the record, that over time in the past, historically, there had been different methods of mining used on the property. And that But how about combining the reclamation plan and the financial contributions that are supporting the reclamation plan? Doesn't that suggest, the reclamation plan and the amount of money, that this is really an operation of a given moderate size? And that all of a sudden, if you explode it in size, you've got to explode it in regards to the financial contributions, and also the reclamation plan has to be able to be tailored to that increase. So that really arising out of the reclamation plan and the financial contributions, there's an expectation that everybody can basically follow that it's supposed to be this kind of operation, and all of a sudden, at least according to Mr. Gamble's testimony, he's shocked that this is much bigger than the reclamation plan and the financial contributions would suggest. And of course, the jury was entitled to disbelieve Mr. Gamble's testimony. The financial assurance mechanism is something that's subject to review, I think, annually. And there was expert testimony that the dramatic increases were unjustified, that we were with – there was expert testimony that we were within the scope of the reclamation plan. One of the disputed issues here has been the county's claim that we weren't allowed to keep these pits and turn them into ponds. The reclamation plan expressly calls for end uses like swimming, fishing, waterfowl habitat, and grazing. There was expert testimony. And these are mining and environmental experts. Didn't the financial contributions go up and down? So what happened was they increased it to 700,000 plus. Then all of a sudden, then the county decided to reduce it. It got reduced way down. And then in 2002, when you – or 2012, when you had the jump to 8.8 million, basically you've got a verdict in regard to that, that that's retaliation. And you still have that verdict. An unchallenged verdict. Right. But for some reason, the county goes up and then they voluntarily reduce it again. And so it's going back and forth as you work this process out. Is that correct? Well, Your Honor, I think we use the term Kafkaesque in our brief because I think that's a very good term that describes this whole process. This was a multiyear process of shifting pretext, shifting rationales. You know, first they were talking about the pit capture. Then their consultant told them that's not a risk. Then they talk about the expansion. And you're at the hearings and they're not talking – they're expressly saying we're not here about pit capture. But if you're really talking about a conspiracy here involving state regulators for a purpose of shutting you down, you would not expect behavior like all of a sudden they shoot the financial contributions high and then, must be based upon complaints, reduce it way down again. This is not a consistent theory. It's sort of Kafkaesque. It's up and down. Well, they changed the goalposts on us while we were trying to keep going. The vested right determination is the more direct thing that shut down our operation. They revoked the vested right via this letter. The Calvert case says if you're going to redetermine the vested right, if you're going to determine it, that needs a formal process. That didn't happen. At these hearings, which they've tried to present at various points in this case as a post-deprivation process for the vested right or not, at the hearings they said we're not here about the vested right. You have to go across the street to the courts. We're only here about do you need a permit. But if you don't have the vested right, of course you need a permit. So that's catch-22. Heads I win, tails you lose. Your Honor, I – I know you're over, but can I ask a couple questions because with all due respect, I cannot envision me supporting a total grant of $105 million here. But I don't know what to do. It seems to me 100 years is outrageous. I mean, I've never – it's like giving somebody a lottery ticket. I mean, you have no idea whether this thing's even going to be viable 20 years from now, 30 years from now. I've never seen a case that is awarded damages based on 100 years to get it out. So what do we do with it? Was that – first of all, was that brought back to present value? Yes, Your Honor. And I'm – You're really talking about a billion-dollar verdict that was brought back to present value. I don't think quite, but – Well, 100 years? But Your Honor, I'm glad you asked that because I do want to address that. One thing, it's not actually 100 years the damages amount, and I'll come back to that. Importantly, the evidence, the primary evidence for the amounts the jury awarded is the testimony of Dr. Gil Coleman, our expert, our damages expert. And they have not challenged on appeal that underlying evidence. You know, at the margin, they have, you know, some new arguments at the margins. But they don't challenge that evidence. So there's evidence, and of course, the trial judge looked at that and said, this is not contrary to the weight of the evidence, and that's an abuse of discretion review. The – now, it's not quite 100 years. Our expert testified about up to 100 years. But the amounts that the jury awarded are actually more like – he gave two figures. He gave a 100-year figure and a 50-year figure, and the jury's verdict came out around the middle of that. The – I'm sorry. I thought it was 81 million for the hardest case. Eighty-one million was the 100-year figure, and they got 75. There's – they got 75, which is less than the 100-year figure. There was also, Your Honor, evidence of additional losses, such as having to sell their equipment at a loss and things like that. How much was that, selling the equipment at a loss? Off the top of my head, I don't remember, but I think a few – a few million dollars. But very importantly, the valuation here – this was a valuation of this business enterprise. It wasn't just these individuals could expect to live for another 100 years and get this income. What they shut down, what they destroyed, was a business enterprise, hard as sea, sand, and gravel. And there was – from which both families profited. And there was testimony about, you know, there are younger family members – You know, that – I understand your point about there's a business enterprise, and it's irrelevant that the particular owners will no longer be alive. We're very accustomed to that sort of thing. If there was that much money available, and the only thing that the Hardesty's and the Schneider's needed to do was to pay their – say, a couple hundred million – a couple million dollars for a permit and put up the money for the reclamation, if it was really worth that much money, why in the world did they shut it down? Well, for one thing, Your Honor, the county, in a break from tradition, from its traditional practice, declared that we would not be able to continue operating while a permit application was pending. A permit application – you know, these people weren't cash rich. Joe Hardesty, who is sitting back here in the green plaid shirt, he testified about how, you know, their business made a lot of money, but they always poured it back into the business. They lived in the same trailer house since 1979, because that money went back into the business. They had to go $5 million into debt fighting this stuff. So they didn't have that cash available. They weren't allowed to keep operating. There was testimony to the effect that this permitting process can take up to 10 years, if you get it approved, and it's costing you millions of dollars while you're going through this process. There's testimony that Granite Corporation, Jay Schneider, who's sitting back here, worked with the Granite Corporation to try to get them to take over the mining. Their expert, Jeffrey Light, who testified at trial, assessed the reserves and said, it's not economically – the permitting costs don't make it economically feasible. So you had – what you had – But that sort of plays into Judge Fletcher's point, which is if the permitting costs don't make it economically feasible, it's hard to see how a $2 million investment – I think a lot of people would take that money if they could get $105 million out of a $2 million investment. If the – it's not – it wasn't economically feasible to pursue this as a permitted mine. The business enterprise had been built up as a vested mine, and there was a 30-year track record with projections out that the business could keep going, that it had substantial reserves. You also – you had these stockpiles, which had been in existence already for decades and had an indefinite shelf life, and that's part of keeping the business going. You replenish these stockpiles, and then you sell them off, and these stockpiles remain there. Okay. We've taken you well over time. Thank you, Your Honors. May it please the Court, my name is Richard Ross. I'm counsel for the Snyders, and my co-counsel, Mr. Peterson, is here. Hopefully I still have some time in spite of our earlier overrun. Well, you've got three minutes. All right. Thank you, Your Honor. This is not an enforcement case. This is a case of shutting down a small operator out in the country in Sacramento County. Now going to that 2002 Board of Supervisors adoption of the reclamation plan, they made express findings when they adopted the reclamation plan. They found that the project, the Snyder Historic Mine reclamation plan, was consistent with land use designations and consistent with zoning. This is a determination by the Board of Supervisors. They found that it mitigated for environmental effects. They found no effect on the neighbors. They found that it had been endorsed unanimously by the Community Planning Board. And they found that the mine was a vested mine under SMARA, and it was therefore exempt from local mining regulations. As Judge Mueller pointed out, the Board also pointed out that it was an appealable order. I think the statute on that stuff is 90 days. That was 18 years ago. It was never appealed. It's final. Yes, there were enforcement allegations prompted by political influence brought about by Snyder's. They're never – or not Snyder's, Teichert, excuse me, all these German names. But the reality is we had a long history of zero violations at that mine. And then all of a sudden, Teichert acquired the Pelican property next door and was going to develop a mine there. And we have these Teichert enforcement matrices that show up throughout the record. We had over 30 agencies for two years descending on the ranch. Some of that investigative activity was pretty harsh. We were required to respond to something virtually every day. They drove me out of business. We were putting together geotechnical reports and all sorts of stuff. We only sued – Snyder's only sued the county and its agents because the rest of those agencies, after two years of intensive investigation on everything you can imagine, they were looking at building permits and business licenses, anything they could find. Not one agency could find one single justification for shutting down the mine. Only Sacramento proceeded. And what did Sacramento do? Sacramento decided that they would suddenly just not recognize our land use entitlements. Even though the Board of Supervisors had made a binding, final decision that we were consistent with zoning and exempt from the local mining law because we had this state vesting, they just said, well, you need to change the zoning in your part of the county and yeah, you need to get a conditional use permit. There was testimony at trial, a conditional use permit for a surface mine in Sacramento County can take 10 years and $15 million. And in the first time ever in the testimony, the Board of Supervisors struck finding number 21, which would have allowed the mine to stay open. But if I might make one further point. No, no, you saved three minutes. Thank you, Your Honor. No, no, I'm going to say, but if you just sum up, I'm not going to cut you off. All right. Thank you, Your Honor. Operating a surface mine in California requires three things. It's like a three-legged milk stool. You need to have a permit, which is excused if you have a vested right. You need to have a reclamation plan, which the mine had. And you needed to have financial assurances. Judge Mueller expressly finds in her order that there was no justification for the increase in the financial assurances. This was done in a sequential method, so we couldn't fight back. We're talking about summing up. Okay. 2009, they revoked the permit. 2010, excuse me, they do the revocation. 2011, they say you don't have financial assurances. You need to redo your reclamation plan. And then the third year, they said we didn't have financial assurances. Between the two, we could have never gotten another permit or gone back into operation. Unless there's questions. Thank you. Thank you. Would you please put three minutes on the clock? Your Honor, subject to the court's questioning, I want to address first why the county should get judgment on the substantive due process claims and then turn to why at a bare minimum a new trial is necessary. I didn't hear any defense whatsoever of the chosen profession theory. And I explained in my original remarks why there's no procedural obstacle to this court's claim that defeats the $75 million hardesty claim as a matter of law. If there is to be a remand, that should form no part of it. At a minimum, if there's a new trial, that would need to be retried. It's legally untenable. With respect to the entire substantive due process verdict, the whole $105 million, the theory that's being advanced by the plaintiffs here is really remarkable, which is that if there's an arguable point of state law, in other words, what was the scope of the reclamation plan? What did the vested right entail? That can get tossed to a federal jury, who can then impose whopping liability on government officials. That's not how substantive due process works. Instead, substantive due process is meant to root out only the truly conscience-shocking and that's the language of the case, is conscience-shocking, egregious government action, where it's fairly debatable that the government was acting reasonably as it was here. There can be no liability. Now, the court asked, when my colleague was arguing, what would the remedy be if the individual defendants were removed from the case? And I think that while the county should get judgment for the reasons that I argued, if the individual defendants were removed from the case, a complete new trial on liability and damages would be necessary, and here's why. The theme of this case, as illustrated by the Punitive Damages Awards, was demonizing the actions of these individuals, and successfully so. The jury was clearly inflamed. It awarded more uncompensatory damages than the plaintiffs asked for, and then went so far as to award punitive damages against the individuals on a very slender evidence that they did anything culpable. So the county, no less than the individuals and no less than the plaintiffs, is entitled to a dispassionate and fair decision-maker on all theories, liability as well as damages. So if there's to be a new trial, it should be a new trial on liability as well as damages. But at a bare minimum, the damages awards are patently excessive for all the reasons we've been discussing. So at the very least, there should be a new trial on damages, or remitted by this court. So unless the court has any further questions, I'll submit. Okay. Thank you very much. The last case this morning, Hardesty v. Sacramento County, is now submitted. Thank counsel, both sides, for their arguments, and we're now in adjournment.
judges: W. Fletcher, R. Nelson, Sessionsiii